Mejia Miranda is submitted and will take up U.S. v. Aloba. Thank you. May I proceed, Counsel? Thank you. Good morning, your Honors. My name is Karen Bucher, and I represent Oriyomi Aloba. And with the Court's permission, I'd like to reserve five minutes for rebuttal. Please watch the clock. Yes, your Honor. Well, this is the case where the Los Angeles Superior Court experienced a phishing attack on their computers in July 2017. And on appeal, Mr. Aloba challenges the denial of the motions to suppress. But as the District Court stated in its minute order, the focus really here in this case is the legality of the first search warrant dated July 28, 2017, to search all the email accounts. Well, let me make your job easier for you. Let's assume that first search warrant is unconstitutionally overbroad, for a moment. Why doesn't the independent source doctrine, nonetheless, require denial of the motions to suppress? Well, I don't think that came into play. What happened, it's sort of very simple. There's so many motions to suppress. Well, but that's, here's my understanding, so maybe I'm wrong. There's subsequent federal warrants, do you agree? Yes. That come up with the evidence that's used at trial against your client, correct? Yes, but they were all interconnected. Well, then tell me, that's what I'm asking. So let me clarify this, because this is, I'm going to ask Ms. Palmer this too, because this is what bothers me about this case. The independent source doctrine is supposed to be that the evidence was used in other means, but here, what the US Attorney's Office did, or is, it issued a warrant to obtain the evidence that was in the hands of the state police in the form of a DVD. It didn't actually, it got the evidence from the people who had gotten it through the bad warrant. It didn't somehow get it some other way, which is what I understand traditionally the independent source doctrine is. I mean, it was packaged in a DVD that was created to hold all this evidence in the state police who had obtained it by an invalid warrant. So it's, now that I understand, they couldn't have gotten the same evidence really, truly independently, because it was no longer there. I don't believe they got it independently. I put a lot of thought to this, because it's sort of complicated, but I kind of made it very simple. What happened was, through that first search warrant of July 28th, they found a 2015 chat where this phone number appeared, a 512 phone number. And they, wow, that's going to somehow make a connection. And that eventually connected Mr. Loba to the case. Without that telephone number from the very beginning, I don't think he would have been implicated at all. But I wanted to ask about that, because that's part of the record I'm not sure I understand. As I read the affidavit for the first federal search warrant, if you will, it says, here's what I did. I knew these email addresses were there from the investigation. I did the following things, none of which said, look at the state production. And I came up with the following probable cause. And so the affidavit doesn't seem to be based at all on anything seized in the state. They may have ended up seizing something, that's a separate question. But I want to focus on the affidavit. The affidavit for this first federal search warrant, does it rely at all on anything that was discovered in the state? Yes, I believe it does. The first- Tell me what? Tell me what it relies on. The first one was a state warrant. Right, right, I understand. The second one, okay, now they have the telephone number. The second state search warrant was the AT&T search warrant, where they searched- Yeah, I'm not worried about the state warrants. I'm worried about whether the first federal warrant was based on an, was in an independent source of this stuff. And so I, so in order to do that, at least in my view, I go look at the affidavit for the federal warrant. And the affidavit for the federal warrant doesn't seem to rely on anything discovered in the state search. So tell me where I'm wrong in that. Tell me where the affidavit for the federal warrant relies on something discovered in the, what I would call the illegal state search. From my view, because they, when they find out who the telephone number belonged to, it was Mr. Loba. Then after that was the first federal state, the federal search warrant dated November 6th. And what they asked for in that warrant is simply, we want to review the DVD that contains all the evidence from the- Right, now they may be seizing. See, that's the difference I want you to focus on for a moment. It may not be important, but I want to get it straight in my mind. As Judge Wardlaw points out, what they seized with the federal warrant may have been something that was seized with the state warrant. I don't doubt that for a moment. Whether or not they could have gotten the same information separately is not, is a separate issue. I'm trying to figure out whether or not the affidavit that gave probable cause for the first federal warrant, is it all based on anything that was discovered in the illegal state searches? You know, off the top of my head, I can't pinpoint anything except for what that warrant was, the request was, was to look at the first state warrant. And after, after the federal government reviewed the contents of the July 28th and they, they found, also found the 2015 chat with the telephone number. And then they found out it was Mr. Lobos and where he lived. And that's, and then that's how we get to the second federal search warrant from Houston, where they requested to search the Texas residence. They only were able to do that was from looking at the, the, the DVD and getting the information of the telephone number. What was used from the Texas residence at the trial? Oh, the his computer was found, the contents of his computer, a thumb drive. And also, he also admitted that, that 516 or 512 whatever telephone number was his. So he admitted that, that was his number. And that, and that was the crutch of this case. That's how it put everything together. It was, it was like a building block. And, and, and that's how it, at the end, they were able to search that one residence in Katy, Texas. They found Mr. Lobo. They found his computer. They found all the connection to the case. And he admitted that telephone number was his. But let me, let me ask the question differently. And I'm not, I'm really trying to get the facts straight in my mind. Let's assume the first, the state search warrant was based on probable cause. But it was just too broad. It covered too broad a period. And therefore, it should. Super broad. Too, yeah, too broad. You, super broad. You, you, you get to, you get your characterizations if you want. And, and a judge said to them, no, this warrant is overbroad. Went to see a magistrate judge, and the magistrate says, I'm not going to grant this. And they came back with exactly the same affidavit, but with a limited time period. Would a second warrant be valid? If, if the time period was around the time of the offense. Yeah, whatever time period you want. Yes, yes, yes. The time, yes. A super time period, in your words. A super good time period. The second warrant would be good, would it not? If, if, if the date was restricted to the time of the offense of. Okay, so that's, that's, I sort of view the federal warrant in those terms. And so it seems to me the warrant on its face is probably okay. Now, are you complaining about what they actually seized under the warrant? Or whether there was, whether the warrant itself was valid? See, from my understanding of the federal search warrant, they just asked to review the contents of the state search warrant. Which, of the July 12th. No, but there's an affidavit with the federal warrant from an investigator who says, here's why I have probable, we have probable cause to seize the following items. And it seems to me it's not overbroad as to time, at least from my perspective. You may disagree. And it seems to me to establish probable cause. So if I start from the premise that the first federal warrant is valid on its face. What's, and, and it seizes some stuff that gets used at trial. What's the problem? Is the problem is that what it seized was something that the state initially seized incorrectly, or what? Because I think it, because it was based on the initials of state. Well, tell me how, that's my question. Tell me how it was based on the initials. It may have sought the fruits of the initial state search. But it, but the affidavit doesn't say I have probable cause because there was a state warrant or there was a state search, it says here's my, here's my reasoning. So what part of that reasoning came from the state search? They were all working together, the federal and state, you know, agencies. And I can't remember exactly in, in the, in the affidavit if it said this or not. But I believe that the, that the, the federal, the federal government knew about this telephone number. And they even admitted they knew about this telephone number that was in the 2015 CHAT when they applied for the search warrant. But is, is that in the, is that in the warrant? You know, I, I, standing here, Your Honor, I, I can't, I can't tell you that. And I'm sorry, we can all look at it, but that's what was in the CHAT. I, I could look at it later, but it was my impression that they, that they, that the federal agents had the same information as the state, and they just wanted to take another look at it, you know, to take a look at. Look at EER 622, Statement of Probable Cause, Summary of Probable Cause. So look at paragraph seven and paragraph eight. So it, it is talking about the LA District Attorney DVD. Is that what you're referring to? Yes, the, the July 28th warrant. Well, it's. Which became a, a DVD. Yeah, they're referring to that. So are you saying that's why this one was also invalid? I don't, I mean, I'm trying to follow your argument. It, it, it, it's our argument that the, the federal search warrant to search the DVD of the state search warrant isn't valid for the same reasons why the state search warrant. All right, you're going to reserve five minutes. Let's hear from Ms. Palmer and then you can. Okay, and also on, but I just, I did want to raise a sentencing issue if I, if I have time. What's the second issue you want to raise? Second issue. But you're going to lose, lose all, use up all your time. Why don't you just wait and bring it up on federal. Good morning, your honors. May it please the court. Carly Palmer on behalf of the United States. The fatal flaw in defendant's argument is that it overlooks that the, the fact that the emails that the government searched were permeated by fraud. These were accounts that were specifically created and used to test and harvest these emails and credentials that were stolen. Not a critical fact at all. The critical fact, I mean, after all, the fact that you found evidence of guilt doesn't mean that the warrant, that the searches were okay. So help me with what we're, we've been trying to ask questions about here. Let's assume for a moment, just for, for purposes of assumption, that the initial state warrant is invalid because it's overbroad. And I, first assumption I'm going to, second assumption I'm going to ask you to make is that the first federal warrant is valid because it's based on probable cause and the, the affidavit is not based on anything discovered in the state warrant. Troubled by the question Judge Wardlaw tried to ask at the beginning, which is that what you eventually seize are the fruits of the state warrant. Correct? Yes, your honor. Okay, so given those two assumptions, how can those, how can that DVD be admitted into evidence? This court's ruling in Romero, which has been the law of the land for more than 40 years, and it differentiates between seizure and search. And Romero says that even if there's an overbroad state warrant, the government, the federal government can then go and get a separate warrant to search those documents. To search those documents being the documents seized in the state. Correct, as long as the probable cause is independent. And here we didn't have a rule 41 motion, you know, trying to reclaim the items. This is a challenge to the search. And the protection for the search is to make sure that the probable cause is independent. Okay, so now I get to the question I ask you to assume. Why is the first federal warrant independent of the illegal first state search? And I've asked you to assume it's illegality. Yes, your honor. So the same page that Judge Wardlaw referred us to, page 622. If you look at footnote two there, the federal warrant expressly discredits any reliance on anything obtained through the state warrant. It informs the magistrate judge that the warrant was obtained, but it doesn't use any of the evidence that was obtained through that warrant. It doesn't talk about the 2015 text messages, where the defendant is identified as the person. So the probable cause is completely independent. And under Romero, this would fall under the independent source doctrine. Address what your friend was talking about, which is the telephone number. It wasn't used in the affidavit. It wasn't used in the, I didn't think it was, but it's a long affidavit. No, so the probable cause finding is completely independent. This fully falls under Romero. But I would like to go back to my first point, which is that we don't have an issue with the state warrant because both of these email accounts were permeated by fraud and the affiant told the judge that. If you look at page 503 in the record, the affiant tells the state judge, based upon my training and experience, I know that suspects open free email accounts from companies like Google and Yahoo for the sole purpose of using the account to commit their crimes. Therefore, I believe the email accounts used by the attackers in the case were opened with the intent to commit fraud. And I request records relating to those accounts starting on the date the accounts were opened. So this is like Cal or SDI, Future Health or Smith, where this court has said that the entire business is permeated by fraud, you get to look everywhere. Wait, 503 is, that's part of the July 28th application? I believe it should be, but I'm confident that the affidavit for the state warrant includes that information. Yeah, that's my question. I know it's in the federal warrant. It's certainly in the state warrant, Your Honor. Is it in the state warrant? It is. Is that where you- Is it in the state affidavit? I'm sorry. Yes, Your Honor. And the affidavits are incorporated into the warrants for both the state warrant and the email warrant. They're expressly incorporated. And the affiant says, these were made for that purpose. And then he describes all the ways these accounts were used. Looking at the Superior Court employee's emails, they know these accounts were the ones that were used to test the new stolen credentials, to harvest the stolen information from the fake Dropbox website. This wasn't defendant's legitimate email account, so there's no risk of going through decades of personal information. That's what makes this so different from KidSaver. This isn't the email account the defendant uses to talk to his family or his doctors. These are accounts that were created for this illegal purpose. So because of that, the state warrant is allowed to be broad. Under this court's finding in Smith, even an extraordinarily broad warrant authorizing the seizure of essentially- You're arguing that the July 28th warrant is valid. Yes, Your Honor, we are. And in fact, the fact that this is an email account makes it even less invasive than if you were to go into a criminal business, a boiler room, and physically take all of their documents. It's less invasive to look at someone's email account. That's the same analysis that the District of Arizona used in the Cummings case to find that someone had access to, I believe it was, 12 years of six email accounts. The other thing is that here the state warrant expressly said, we're interested in this particular crime, and we're interested in identifying the perpetrator of the crime. So when you have a perpetrator who's skilled at aggravated identity theft, who's using alias accounts, the way to find their identity is to look broadly and try to find the fingerprints that have accidentally been left behind. So for example, at trial, a massive argument that was made by the defense in closing is the defendant wasn't the person who used these accounts to commit these crimes. That's what the defense focused on in closing. That's what the government argued in rebuttal. And a great piece of evidence was this 2015 chat where someone reached out to the defendant, used his name, and he said, don't use my name here. But to find those fingerprints, you have to look broadly. Not sure I can tell from this record, but maybe I can, and I just didn't find it. How long was this account opened before the phishing, that was the subject of the investigation, occurred? That information's not in the record, Your Honor, but the oldest information that was used at trial was approximately 20 months before the attack. And so under Flores, this court has said, if it's not used at trial, then we don't have to worry about suppressing it. And 20 months is very reasonable. Again, we're looking for sweeping, circumstantial evidence of identity, and where you have a conspiracy that involves multiple crimes with people coordinating, getting phishing kits, all of that. And a modus operandi by a defendant who has made an entire criminal enterprise out of these sort of phishing schemes. Can I ask some questions about the sentencing? Yes, Your Honor. I'm troubled, and it appears to me from the transcript that the AUSA was troubled at the sentencing. Rule 32 requires the district court to specifically rule on objections that are raised. I can't find where there's any rulings. And there is no reference to any of the 3553A factors. So why shouldn't this sentencing be sent back for re-sentencing? Yes, Your Honor. So we were lucky that we had both a cyber AUSA and a former appeals AUSA at that hearing, AUSA Ryan White. And he did ask the court to clarify- Are you using his name because you know he's my former law clerk? I had gotten that information. But I do think it was helpful that he had an appeals background, because he specifically inquired of the judge. I mean, no one's criticizing the government at sentencing. The judge's question was about the judge. And I'd see, I kind of view the experience of the AUSA as hurting your case. The AUSA said, judge, you've got to do this right. And the judge said, leave me alone, leave me alone, I'm busy sentencing here. I think under Valencia Barragán, the judge did do it right. He said, I adopt the findings and calculations of the PSR, and the PSR is entirely about the 3553A factors. I tried valiantly to get him to do it right, and politely. And I believe the court got there. At pages 29 and 36 through 37 of the record, he adopts the reasoning of the PSR, which is based entirely- I know, but the PSR is wrong. Regarding which factor, your honor? It's not 34, like the PSR says, it's 32. And there isn't any explanation as to the 145 months. And in fact, ASUA White said to the judge, after he said 100 and whatever months, and then followed by 24 months on each of the counts, the AUSA said, well, judge, I assume what you meant was that the first of the aggravated identity theft goes with count two, and then he went through a litany, and the judge said something like, yeah. I mean, is that, you really think that this is a sentencing that complies with Rule 32, and with this court's mandates to the district judges when they're sentencing people? I do, your honor, because of the court's listening to the arguments that were made. It's adoption of the PSR arguments, and this court's finding in Rungell, that we need to assume that district courts know the law. And that they have an obligation to consider the 3553A factors, particularly when the judge is imposing a low-end guideline sentence after seeing a trial. We may end up with the same sentence on remand. That's really not the issue. Focus for a moment on the immigration status of the defendant, which would seem on its face to argue against supervised release in the absence of the judge saying something like, I'm afraid you may return. We often see this in Mexican immigration cases, right? I'm imposing this because you snuck across the border seven times already, so I want you to be under supervision if you come back. Nothing here about that. The guidelines sort of suggest against it. The defendant says, take my immigration status into account, and the judge doesn't say anything. Doesn't that at least require a remand? No, your honor, because in Gonzalez, this court found that there was no compelled consideration of immigration status. Moreover, the argument that defendant raised regarding his immigration status is a different argument than he's now raising on appeal. But doesn't the, don't the guidelines say if somebody's going to be deported, you probably shouldn't put supervised release at the end of the sentence, or at the custodial sentence? They can, your honor, but in the central- Well, I know, but that's what the guidelines recommend that it not be done. And I think Judge Hurwitz's point is, doesn't he have to say something if that is an objection that was raised, and he did raise it at the sentencing. And in addition to that, I can't find any place in the record where the judge actually ruled on the objections that were made to the pre-sentence report. I know Mr. White made some arguments about it, but the judge didn't rule. And isn't he required under Rule 32 to make a specific determination on objections? I think by adopting the reasoning of the PSR, he was rejecting the objections to it. And there was no challenge to supervised release here. The challenge here was to the term. The challenge here was, this guy's going to get deported anyways. It's a waste of taxpayer money to put him in jail for so long. And the court disagreed. The court looked at these 3553A factors, found that this was in the heartland of the cases. And while he may not have been particularly expressive regarding it, he did everything that the law requires. Let me push back a little bit on the pre-sentence report. Do you really think this pre-sentence report weighs the 3553A factors? Or does it just say, here's what I've discussed. PSRs don't normally say, you know, here's the guideline sentence, and I've weighed the 3553 factors, and judge, you should depart or stick or go up. It just says what they are. And so doesn't the statute and the rule require the judge to engage in some weighing or consideration of them, as opposed to just recognizing what they may be? Yes, Your Honor, but he doesn't have to be verbose in doing so. And the PSR here found no reason. Can he be silent in doing so? But he can say, I adopt the PSR, which says I find no reason for a variance. I find no reason for a departure. Here's how the calculations come out. But he didn't say that. I mean, and so next week when I'm sentencing people, all I have to do is go into the court, listen to the arguments, and say I adopt the PSR. I am sure that this court would prefer you do something more verbose, but remand isn't required. Well, I don't think it's verbose. I think it's what the law requires. It's rule 32 requires it. And I'm struggling. Just point to me in the record where he ruled on any single objection. I think he, by adopting the PSR after hearing all the objections, he did that. Okay, well, we're not communicating because I think adopting the PSR is a shorthand way of avoiding the requirements of Rule 32. But you can't tell me where he complied with Rule 32, can you? I believe that the statements he made on the record comply with Valencia Berrigan, and I only have a minute left, so I'd like to turn very briefly to the good faith analysis, which is the fact that under Shesso, all the arguments that show that a broad search was needed here for identity purposes, and because these email accounts were permeated with fraud, they apply all the more so to show that the officers acted in good faith when they saw these, you know, very lengthy affidavits that included screenshots, and talked about protocols for how to go through these. And they got a warrant for every single step. Which officers acted in good faith in these? The state ones and the federal ones, and the only thing the defense has pointed to otherwise is the fact that there wasn't the state range restriction, but this court found in several cases that that's not required, in Johnny, in Hill, in Hay, in Shesso. There are fact specific analyses, and this is the kind of case that required a broad warrant so that they could find those fingerprints and identify the person who attacked the court system. And for those reasons, we would ask you to affirm. All right. Thank you. Thank you. Your Honor, if I might briefly talk about the sentencing issue. The one that bothers me the most is the immigration issue. I believe the district court should have at least stated on the record that he considered the fact that he was a deportable alien in deciding his sentence. This is important because when you're a deportable alien, you serve more time than a U.S. citizen. You don't get the six months released to a halfway house. You're not eligible to enroll in the RDAP program to get off another year off your sentence. So an average deportable alien serves 18 more months than an average U.S. citizen. And on top of that, right before the release from their sentence, ICE picks them up, then they go into deportation proceedings, they start off, and that could take several months. Your objection is really procedural, not substantive, is it not? In other words, had the judge said, I've taken into account that you're an illegal alien and you'll suffer other consequences, and therefore I'm going to give you a below guideline sentence of 145 months, you'd have no complaint, would you? Well, then he considered it. See, that's... Well, that's... We don't know whether he considered it, is my point. It's not that the sentence imposed was unjust. We just don't have the reasoning. That's correct. But I feel that it should have been a lesser sentence because he's serving two years more than he should than... Well, but if he gave him a guideline sentence, how much longer would he be serving? About two years, because... He gave him, in effect, credit for those two years by giving him a two-year below guideline sentence. Substantively, I think, if the procedure had been followed correctly, my point is, I wouldn't have a substantive problem with this sentence. Your argument is really procedural. We just don't know whether the district judge... I'm not sure if it was two years. I thought that... Well, you said two. That's why I asked. Oh. No. I'm glad you mentioned that. What I meant was, a person who's a deportable alien will serve an extra two years... And my question was, how far below the guideline was the sentence imposed in this case? In this case, his sentence was a 145 months, and I think the guideline top was 151. That's a... No. That's a six-month credit, in fact. Okay. That's what I was asking. Yeah, but that's because of the 24 months consecutive to the original underlying convictions. Right. Because the original sentence, I believe, was 121, and then... Yeah, but that consecutive 24 months has nothing to do with the guidelines. That's mandatory. That's mandatory. But what was the guideline sentence on the non-consecutive part of the convictions? I think it was 121. And what did the judge impose? Well, that's... The top of the guideline was 151. That's what... Okay. But I think my point here is that this immigration issue is really important, and I don't think... The district courts do not take it into consideration, and I think it should be remanded so the district court can consider the immigration issue and decide whether or not he should receive a lesser sentence because he's serving an extra couple years just because he's a deportable alien. All right. Thank you, counsel. Thank you. U.S. v. Aloba is submitted.
judges: WARDLAW, HURWITZ, Molloy